Argued and submitted October 9, affirmed November 21, 2012

In the Matter of H. G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent*,

*v.*

J. C. G.,
*Appellant.*

Washington County Circuit Court J090134;
Petition Number 02J090134;
A151143

291 P3d 787

Megan L. Jacquot argued the cause and filed the brief for appellant.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

In this juvenile dependency case, father appeals from a judgment entered after a permanency hearing continuing the child in substitute care and denying father's motion to dismiss the wardship. At oral argument, father's counsel advised the court that the child is no longer in substitute care and that the only remaining issue on appeal is whether the juvenile court erred in denying his motion to dismiss the wardship. We affirm.

The child, H, was born in 2001. At that time, she lived with her parents in California. The child's mother died in May 2005, and after that, the child lived for a time with her maternal grandparents in California. Father subsequently moved with the child to Oregon and married the stepmother, who became the child's primary caregiver.

DHS first became involved with H in May 2009, when she was placed in protective custody after school personnel reported unexplained injuries on her face that were subsequently diagnosed as resulting from physical abuse. The child is developmentally delayed and could not explain the cause of her injuries. She remained in protective custody until February 2010, at which time the dependency case was dismissed, and the child was returned home.

Subsequently, DHS received four reports of physical injury to H's head that were concerning for child abuse. A jurisdictional petition was filed, and the juvenile court found H to be within the jurisdiction of the court and a ward of the court based on findings that (1) the child has been physically abused by her stepmother, who admits to abusing the child in the presence of father; (2) the child is vulnerable to future abuse due to developmental delays that prevent her from being able to report how she received extensive injuries; and (3) "[d]espite evidence that said child has been abused and despite ongoing unexplained injuries, the father and current caregiver are unable or unwilling to acknowledge the above and are therefore unable to protect." The court continued the child in substitute care with a case plan of reunification and ordered that the stepmother have no contact with the child.

Father participated in all of the services offered by DHS, but declined to acknowledge that the child had suffered physical abuse at the hands of her stepmother or to end his marriage to the stepmother.[1] The child remained in foster care. In order for the child to be returned to father's care, DHS required father to present a safety plan that would prevent the child from having contact with the stepmother. As soon as father was told by DHS that the stepmother would have to move out of the house in order for the child to return home, the stepmother found an apartment and moved out the following week.

The child continued to have regular contact with her maternal grandparents in California. DHS sent a request to the State of California under the Interstate Compact on the Placement of Children (ICPC) to determine whether the maternal grandparents could be a long-term placement for the child and received initial approval. DHS accordingly sought approval of a concurrent permanency plan of guardianship with the maternal grandparents.

The juvenile court held a permanency hearing on March 6, 2012. Father, who asserted that he had complied with all of DHS's requirements, sought dismissal of the wardship and return of the child. It was undisputed that the stepmother had moved out of the family home in Hillsboro and was living in an apartment in Beaverton. Father had also arranged for H to have after-school care with a "safety supervisor," a neighbor who is an elementary school teacher and a mandatory child abuse reporter. The neighbor agreed to transport H to and from school, to provide care for H after school and until father returns home from work, to report any signs of abuse, and to be sure that H does not have contact with the stepmother. The child's court appointed special advocate stated at the hearing that he was pleased with father's safety plan; however, he did not favor immediate dismissal of the wardship, expressing the concern that, because father still does not see the stepmother as a threat

---

[1] Father explained that he did not want to divorce the stepmother because he was concerned that it might interfere with her effort to gain United States citizenship.

to H, she might return to the family home if the wardship were dismissed.

The court found that DHS had made reasonable efforts to reunify the family and that father had made sufficient progress toward meeting expectations. However, the trial court continued DHS's wardship and determined that the child should remain in substitute care. The court ordered DHS to consider a community supervision plan so that father could have more visitation, but it did not order DHS to return the child to father's care.

Father appeals, asserting that H should be returned to his care and that the wardship should be dismissed, because he has complied with all of DHS's requirements and has a safety plan in place for the child. At oral argument, father's counsel advised this court that the child had been returned to father's physical custody. Accordingly, the portions of father's first and second assignments of error seeking a return of the child to the family home are moot.

The remaining question is whether the juvenile court erred in denying father's motion to dismiss the wardship at the time of the last permanency hearing. Father asks this court to exercise its discretion under ORS 19.415(3)(b) to review the record *de novo* and find that, at the time of the last hearing, all of the bases for jurisdiction had been ameliorated, because the stepmother had moved out of the house, father had a safety plan in place, and there was no longer a safety risk to the child.

This court will exercise its discretion to review *de novo* only in exceptional cases. ORAP 5.40(8)(c). Because this is not an exceptional case, we decline to exercise our discretion to review the record *de novo*. We therefore are bound by the juvenile court's express and implied findings of historical fact as long as there is evidence to support them, and we review the court's rulings for legal error. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010).

We conclude that the juvenile court did not err in continuing the wardship. At the time of the permanency hearing, father had not acknowledged that the stepmother had caused the child's injuries. The safety plan involving

the neighbor was newly proposed and had not been reduced to writing or implemented. We conclude that, on this record, the juvenile court could reasonably be concerned about father's ability to protect the child from the stepmother and could conclude that the original bases for jurisdiction had not yet been fully ameliorated and that the wardship should continue.

Affirmed.